[Crim. No. 13029. In Bank. Mar. 27, 1972.]

In re GEORGE GREGORY WATSON on Habeas Corpus.

**COUNSEL**

Al Matthews and Arthur Shivell for Petitioner.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, Melvin R. Segal and Robert P. Samoian, Deputy Attorneys General, for Respondent.

**OPINION**

**WRIGHT, C. J.**—We issued an order to show cause in response to the application of George Gregory Watson for a writ of habeas corpus on allegations of improprieties inducing his 1968 plea and adjudication of guilty to a charge of grand theft. Following an evidentiary hearing before a referee and a successor referee appointed by us to make factual inquiries and findings and to report such findings, we have concluded that petitioner's allegations are not supported and that the petition for writ of habeas corpus must be denied.

Petitioner was charged by information with two codefendants in December 1967 with burglary (Pen. Code, § 459), arson (Pen. Code, § 447a) and grand theft in two counts (Pen. Code, § 487, subd. 1). After entering pleas of not guilty to all charges, he subsequently waived the preliminary hearing, withdrew his not guilty plea and entered a plea of guilty as to one count of grand theft. The three remaining counts were dismissed, probation was denied, and he was sentenced to prison for the term prescribed by law.[1] There was no appeal.

The allegations in response to which the order to show cause was issued, are (1) that there was no competent evidence available to the prosecution in support of the charges then pending against petitioner when he waived the preliminary hearing; (2) that his waiver of the preliminary hearing and the inducement to enter the guilty plea were the result of threats and promises made by the investigating police officer; and (3) that he was

---

[1]Petitioner was subsequently placed on parole.

denied his constitutional right to effective counsel. The evidence adduced at the evidentiary hearing will be considered in connection with each contention in the foregoing order.

The facts hereinafter set forth, apart from petitioner's own testimony were disclosed at the evidentiary hearing in connection with the commission of the crimes charged: In September 1967 a garage in the City of Los Angeles was forcibly entered by persons who removed an inboard motor boat and trailer having a value of approximately $5,000 and belonging to Gary Edwards. The boat and trailer were subsequently housed by James Heath, one of the codefendants, at a second, nearby garage. A witness who observed Heath move the boat into the garage was unsure whether a person assisting Heath was petitioner. In October petitioner, Heath and Jon De Rocco, a second codefendant, were observed by a witness, who was acquainted with all three of them, as they set fire to the garage housing the boat and fled before emergency equipment arrived at the scene. After the fire was extinguished, police officers discovered that the boat had been reported as stolen. They moved it, still mounted on the trailer, to an impound yard or garage. Later that same evening the impound yard was broken into and the trailer and boat were removed. The boat was ultimately discovered stripped and abandoned in two pieces at the bottom of a canyon. Two state highway employees identified photographs of petitioner and his codefendants as persons they had seen removing accessories from the boat at the point where it was abandoned. Equipment removed from the boat was found in petitioner's automobile.

Police Officer Jerry Trent investigated the theft of the trailer and boat. His investigations disclosed evidence upon which a warrant was issued for the arrest of petitioner and his two codefendants. After the officer had arrested Heath and De Rocco, petitioner surrendered in November 1967. Trent testified that petitioner confessed to him his participation in all the foregoing conduct except, perhaps, the initial theft of the boat, and that petitioner's codefendants, or one of them, had implicated petitioner in that theft.

Petitioner testified at the evidentiary hearing that his only connection with the stolen boat was his possession of certain parts which he had admittedly taken after the boat had been abandoned. He stated that he had learned through others of the abandoned boat, that he and codefendant De Rocco were then building a boat, and that he had gone to the canyon with other persons to salvage any equipment which could have been used on the boat they were building. He also claimed that Heath had plotted the theft of the boat and had paid a Mr. Cook to steal it, and that petitioner had become aware of the theft only after his arrest.

The referee found, in response to the question "Was there competent evidence available to the People to support the charges against petitioner when he waived a preliminary hearing" that "such evidence was available." ■ That finding, as in the case of further findings hereinafter appearing, is not binding on this court although entitled to great weight. (*People* v. *Chapman* (1971) 5 Cal.3d 218, 224-225 [95 Cal.Rptr. 533, 485 P.2d 1149]; *People* v. *Sanchez* (1969) 1 Cal.3d 496, 501 [82 Cal.Rptr. 634, 462 P.2d 386].)

The foregoing direct and circumstantial evidence adduced at the evidentiary hearing indicates that petitioner was deeply involved in the theft of the boat and the arson of the garage, and that competent evidence was available to the People at the time petitioner waived the preliminary hearing. He was implicated by a codefendant in the entire transaction involving the boat; a witness thought he was a person who accompanied Heath in placing the boat in the garage later set afire; another witness who knew petitioner saw him set fire to and flee from the garage housing the boat; two state employees identified petitioner as a person who had stripped the abandoned boat; equipment removed from the boat was found in his vehicle; petitioner confessed to Officer Trent that he was criminally involved in the entire transaction except, perhaps, the initial theft.

■ Although petitioner denied any guilty knowledge or conduct and had an innocent explanation for the equipment found in his possession, the evidence of his guilty involvement is far more persuasive, at least for purposes of holding him to answer following a preliminary hearing within the meaning of Penal Code section 872. That section "provides in substance that if it appears from the preliminary examination that a public offense has been committed, 'and there is sufficient cause to believe the defendant guilty thereof,' the magistrate must make an order holding him to answer. 'Sufficient cause' within the meaning of section 872 is generally equivalent to that 'reasonable or probable cause' required to justify an arrest. [Citations.] ' "Sufficient cause" and "reasonable and probable cause" means such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused. (*People* v. *Nagle*, 25 Cal.2d 216, 222 . . . .' [Citation.]" (*Williams* v. *Superior Court* (1969) 71 Cal.2d 1144, 1147 [80 Cal.Rptr. 747, 81 Cal. Rptr. 761, 458 P.2d 987].)

It is manifest that in the instant case a man of ordinary caution or prudence could conscientiously, and more likely would be compelled to entertain a strong suspicion of petitioner's guilt of the crimes charged against him. On our independent review of the record (see *People* v. *Tucker* (1964) 61 Cal.2d 828, 831 [40 Cal.Rptr. 609, 395 P.2d 449]) we adopt

the finding of the referee that there was competent evidence available in support of the charges against petitioner at the time he waived a preliminary hearing.

As to the second claimed impropriety, that being the alleged coercive conduct on the part of the investigating officer (Officer Trent), petitioner testified that the officer had threatened to harass him by a series of arrests and the filing of numerous criminal charges. Such charges assertedly were to be filed one at a time, and would financially ruin petitioner by requiring that he post bail on numerous occasions. He also testified that Officer Trent had told him that if he did not cooperate it would not be safe for petitioner to be on the streets and that there was a possibility he could be shot.

At the time of the theft of the boat Officer Trent was conducting an independent investigation of stolen automobiles in the same area. His investigation had led him to believe that petitioner, Heath and De Rocco were involved in numerous such thefts. After their arrests on the boat charges he informed petitioner, his codefendants and their attorney of his suspicions, and advised the suspects that if they would assist the police in identifying and recovering stolen property no charges based upon any disclosed violation would be filed against them. They were also informed that if they did not elect to cooperate, charges could be filed as to each crime disclosed as justified by the continuing independent investigations by the police. It was further promised that an attempt would be made to effect a reduction of bail from $10,000 to $500 as to the charged violations, thus making it possible for each of the defendants to arrange for his release and to assist the officers. All three defendants agreed to cooperate, and Heath and De Rocco spent several days with police officers identifying automobiles which they had stolen, stripped and abandoned. The bail was reduced and no additional charges were filed as to any of the codefendants, although it appears that petitioner did not cooperate with or assist the officers in their investigations.

Officer Trent's testimony directly refutes that of petitioner. He denied promises of probation in exchange for a guilty plea,[2] denied threats of arrests as a means of harassment, and denied threats of physical violence. The officer testified that although he had good cause to believe that petitioner and his codefendants were guilty of numerous vehicular thefts he nevertheless offered them the opportunity to avoid prosecution in connection with any such theft as to which they would make a disclosure, at the same time assuring them that their failure to make any particular

---

[2]The alleged promise of probation is hereinafter discussed in connection with claimed improprieties in the representation provided by petitioner's counsel.

disclosure would leave them vulnerable to prosecution if the police's independent investigations indicated cause for charging and prosecuting them.[3] No impropriety appears when a police officer advises a suspect that he will be prosecuted for crimes which police investigation discloses. Every person suspected of criminal conduct is subject to a like exposure, and there was no different or greater threat implicit in the officer's admonitions in the instant case than the threat ordinarily imposed when one's conduct is under investigation.

There is also no substance to petitioner's claim of threats of violence upon his person in retaliation for his failure to cooperate with the police. Even his own testimony disclosed that his claims of violence or threats of violence were largely unfounded and not asserted in good faith. In response to an inquiry, "Did Officer Trent ever threaten you in any physical manner" petitioner testified only that "you wouldn't actually say he threatened me but he was telling me the possibilities of me getting shot . . . while they were trying to arrest me if I didn't give myself up . . . ." This, the only "threat" of physical violence then claimed to have been made by Officer Trent, occurred when petitioner called the officer by telephone after petitioner had learned of the outstanding warrant but before his arrest. The officer urged petitioner to surrender himself and thereby avoid the possibility of a confrontation with other officers seeking to serve the arrest warrant under circumstances which might impose some risk of harm. This was on a "Thursday or Friday" and petitioner had made plans for the weekend. He was not, apparently, persuaded that he was subject to any real risk as he enjoyed his weekend holiday before surrendering himself notwithstanding the concern expressed by the officer.

The only other testimony relative to possible violence in connection with the officer's continuing investigation of petitioner's conduct related to an admonition that petitioner should not attempt in the future to remove materials from a police impound yard. The officer stated that armed guards

---

[3]A portion of the officer's testimony in this connection, is as follows:

"Q Did you ever tell Mr. Watson that if he did not plead to a charge, that he would be continually rearrested and harassed by being arrested on Fridays?

"A No.

"Q Did you ever say anything to that effect?

"A I told him that every time that we, through our investigation, disclosed that he had been involved in another crime, another instance of car theft, or of grand theft, or of burglary, or arson or any of the crimes that we had investigated in connection with him, that every time our independent investigation disclosed that he had been involved in those crimes, we would arrest him and prosecute him for it.

"I mentioned no day of the week or time."

might fire upon petitioner should such an attempt be made.[4] Certainly no impropriety appeared in that connection. Although petitioner testified to a further instance where he deemed there was an unnecessary show of force, Officer Trent was not involved, the incident was in connection with a possible violation then taking or about to take place, and the matter was not shown to be connected with the investigations here under study. ▮ Petitioner could testify to no specific act or show of violence on the part of Officer Trent or other officers who worked with him. Petitioner was, moreover, apparently not in fear of any reprisal or of the alleged course of harassment as he elected not to cooperate with the police, in spite of his promise to do so, after being released on reduced bail. His lack of concern for his failure to fulfill his promise was well justified, as he was not subjected to reprisals, harassment, or arrests for other crimes of which the police became aware apart from any disclosures by petitioner.

In response to the question "Were petitioner's waiver of a preliminary hearing and plea of guilty to [the grand theft charge] induced by threats or promises of the investigating police officer?" the referee found that the "evidence was strongly against Defendant Watson," and that the waiver and plea were in fact induced by defense counsel's belief that lenient treatment would be accorded his client. Based on the foregoing record we are compelled to the independent conclusion that the waiver and plea were not induced by threats or promises by the investigating police officer.

Petitioner's final challenge goes to the competency of his counsel, and particularly to counsel's advice. Petitioner conferred on at least two occasions with his attorney who discussed the facts of the case and advised petitioner, among other things, of his right to plead not guilty. Counsel,

---

[4]The officer's testimony in this regard was as follows:

"Q BY MR. SEGAL [Deputy Attorney General]: Did you tell Mr. Watson that he might be shot during the course of the investigation, or during an arrest?

"A There was some conversation to that effect. However, it wasn't in the form of a threat.

"Q Would you explain that statement?

"A There had been an instance where some property had been stolen out of a police impound yard.

"There was a second instance where some property we believed was of value to the suspects in this case was impounded in another impound yard, and we staked out in that yard.

"During the course of that stake-out we observed Mr. Watson and two other of the suspects in the case approach the fence to the yard, look inside, but they did not come in.

"Now, during the course of the conversations that we held with Mr. Watson and Mr. Heath and Mr. De Rocco afterwards, we told them that we had been staked out inside the yard, and that had they carried out what they appeared to be attempting, they might have been shot during the course of it.

"It was not a threat; it was conversation."

who also represented petitioner's codefendants, told petitioner that since he had no prior felony record he would likely be entitled to probation, and recommended that he plead guilty. Counsel explained to petitioner, however, that no plea bargain had been reached which guaranteed probation. He testified at the evidentiary hearing that petitioner admitted committing the offense to which he pleaded guilty and that counsel would not have recommended the guilty plea if petitioner had been innocent. Counsel succeeded in effecting a transfer of the case to another division of the superior court with the hope of bettering all defendants' chances of probation.

Petitioner testified at the evidentiary hearing that his attorney discussed the evidence with him, told him that he had a right to proceed with the trial, but advised him to plead guilty to the single act of grand theft because of the strength of the evidence against him on all counts. Although petitioner testified that it was his understanding, upon representations by his attorney, that he would receive probation upon his guilty plea, he conceded that at the time of the plea he understood that any sentence, including a prison sentence, could be imposed at the discretion of the trial judge, and that he had answered affirmatively in response to the trial court's question whether the guilty plea was entered freely and voluntarily.

The record further discloses that Officer Trent, petitioner and his codefendants and their attorney met at the attorney's office and discussed the case against the defendants and the proposals made by the officer as heretofore disclosed. Petitioner thus concedes that his counsel was fully advised of the evidence against him. He claims, however, that he informed his counsel that his only connection with the stolen boat was his possession of those parts he had admittedly taken after the boat had been abandoned, and that he was not involved in the vehicular thefts then being investigated by Officer Trent.

Petitioner does not appear to have complained at the evidentiary hearing that counsel was uninformed of relevant factual matters, was unresponsive to the situation, lacked knowledge of the pertinent rules of law, or failed to take diligent action in what he deemed to be in petitioner's best interests. Counsel's evaluation that the People's evidence against petitioner might well establish his guilt of some if not all of the crimes charged is consistent with our conclusions herein, and negates any claim of irresponsibility in seeking a happier solution than that which might have resulted in a trial of the multiple charges. It further appears that petitioner was fully informed of all matters relative to the consequences of his plea, and that the plea

was freely and intelligently made. (See *In re Tahl* (1969) 1 Cal.3d 122, 127-129 [81 Cal.Rptr. 577, 460 P.2d 449].)

■ Petitioner primarily complains of counsel's clear representation that petitioner would most likely be granted probation when in fact the application therefor was rejected.[5] However, disappointment in the penalty imposed even when counsel hopefully anticipated a lesser punishment, does not require a finding of inadequate representation. (See *Harris* v. *United States* (9th Cir. 1970) 434 F.2d 23, 25.) The record is clear that petitioner understood, or should have understood that there was always the possibility of a prison sentence; that no firm plea bargain which foreclosed such a possibility had been reached; and that the punishment to be imposed always rested within the discretion of the trial judge.

Counsel's statements that probation was likely were not without justification—the probation officer recommended probation with county jail time and the referee indicated that he might have been more lenient had he been the trial judge.[6] We cannot conclude in the circumstances of this case that, because the trial judge was not as lenient as counsel anticipated, counsel's recommendations that petitioner risk a guilty plea and hope for lenient treatment were bad or incompetent advice. We agree with the finding of the referee that petitioner's "only hope was a light sentence," and answer in the affirmative the third inquiry submitted to a finding, "Did petitioner's attorney advise him competently before and after imposition of sentence" on the grand theft charge.

Petitioner asserts further contentions relative to counsel's conduct not directly dealt with by the referee in his findings. ■ It is claimed that a conflict of interest between the codefendants precluded an adequate representation by their single attorney. Petitioner testified that he was aware that he was entitled to the services of the public defender but, after discussions with representatives of the public defender, he voluntarily selected as his attorney counsel who already represented his codefendants. He did not inform counsel of any potential conflicts and none were claimed until

---

[5]The following appears from the transcript of petitioner's testimony at the evidentiary hearing:

"Q In retrospect if you had received probation would you have any complaints at all with [counsel]?

"A Probably not."

[6]At the conclusion of the evidentiary hearing, and before he had made his findings, the referee stated: "Of course, there is some difficulty in this situation, as far as I look at it, and probably I should not say this, but I think that the judgment was rather harsh in this case, although, apparently, from the evidence, it was pretty strongly shown that there was a case there."

after the guilty pleas were entered. Petitioner then told the probation officer that Heath and another person had committed the crimes, and that petitioner was innocent. Counsel testified that once their guilty pleas were entered each defendant attempted to place the blame on the others in hope of receiving a more favorable probation report.

■ The right of counsel guaranteed by the Sixth Amendment of the United States Constitution and by article I, section 13 of the California Constitution means the right to separate counsel only when a single counsel cannot effectively represent multiple defendants. (*People* v. *Chacon* (1968) 69 Cal.2d 765, 773-774 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454].) Effective representation is denied when, among other instances, counsel is put in a position requiring that he take preferential action or exercise preferential judgment in order to better represent one client to the prejudice of another. (See *Glasser* v. *United States* (1942) 315 U.S. 60, 70 [86 L.Ed. 680, 699, 62 S.Ct. 457]; *People* v. *Robinson* (1954) 42 Cal.2d 741, 745-748 [269 P.2d 6].) If he is not so called upon in the proper performance of his duties to each of his clients, then the mere existence of some client conflict which cannot be related to action which must be taken or judgments which must be made does not preclude his continuing effective representation of each such client. In other words, the conflict to be disabling must be one which requires preferential treatment in counsel's conduct in the particular circumstances in which he must act.

' ■ Petitioner in the instant case did not bring to counsel's attention any matters suggesting a conflict of interest which related to issues deemed by counsel and conceded by petitioner, at least in proceedings before the trial court, to bear on the judgments then to be made. We have already resolved in favor of counsel his good faith and reasonable belief of petitioner's guilt of grand theft and the propriety of the course plotted by him in these circumstances. Counsel's recommendations were based on what he deemed to be persuasive evidence of petitioner's guilt and the hope for lenient treatment because of a lack of a prior criminal record. The propriety of these recommendations was bolstered when petitioner raised no issue at the time he pleaded guilty and stated in open court that the plea was entered freely and voluntarily. At this point no conflict appeared.

We cannot conclude from the record that petitioner, after entering his plea, at any time protested his innocence or changed his factual account of events in communications made directly to his counsel. Conflicting claims of individual responsibility for the crimes were made to the probation officer by each of the defendants. Aside from the nature of the alleged

conflict, the mere fact that some conflict between his clients had developed did not in itself put counsel in a position where he had to make any choice between clients, prefer one against another, or sacrifice one's position in order to better that of another. Even upon an examination of the nature of the particular conflict, no preferential action was required, at least insofar as the previously recommended course of conduct was concerned. On balance, counsel had no greater reason to believe in petitioner's innocence after than before the plea was entered. The basic question was still whether on the strength of the People's case and the possibility of lenient treatment petitioner should proceed on his guilty plea to a single count, or expose himself to multiple convictions and whatever consequences would follow on a trial of the cause. In making this single judgment the bare fact of the particular conflict in *post*-plea developments cannot fairly be said to have required counsel to reevaluate his earlier recommendations. Nothing had occurred which weakened the People's case or indicated that the possibility of lenient treatment had been lessened. The reported conflict was thus not one which required any revision of counsel's earlier recommendations, and no question of preferential treatment of one client to the prejudice of another was thus raised.[7]

Although counsel justifiably need not have recognized a conflict for purposes of the plea recommendations or reconsiderations thereof, there remains the further question whether he could properly represent his multiple clients when they were arraigned for sentencing after probation reports. ■ Where a court is required to fix individual penalties to be imposed on codefendants, there is a need for counsel to examine the individual participation of each of them. The issue is no longer the common one of whether the evidence of guilt was sufficiently compelling to justify the recommendation of guilty pleas but rather, accepting the common guilt of his clients, whether there were mitigating factors which should be urged to the court as requiring different punishments based on

---

[7]If, in a particular circumstance, counsel was unalterably and reasonably persuaded of the guilt of each of two clients and could arrange for the dismissal of all except one of the multiple charges should they plea guilty to such charge, he could properly *recommend* such a course although each defendant denied his guilt and accused the other. Such a conflict would undoubtedly preclude counsel *defending* both clients at a trial of the cause as he would then be required to resolve or exercise some preference with respect to the conflicting claims of guilt and innocence. But he could properly recommend guilty pleas as he would not then be required to resolve or even prejudge the conflicting claims to any greater or different extent than in a case where he represented but one of the defendants and was required to make a recommendation in identical circumstances. (See *North Carolina* v. *Alford* (1970) 400 U.S. 25 [27 L. Ed.2d 162, 91 S.Ct. 160], where the Supreme Court held that defense counsel could properly recommend and the court accept a guilty plea to a lesser charge where the defendant, in entering the plea, continued to assert that he did not commit the violation.)

differing degrees of culpability as to the individual clients. (See *People* v. *Chacon, supra,* 69 Cal.2d 765, 775.) A court, for example, might be inclined to grant probation to a defendant who was misled by older, more experienced criminals, but counsel could neither urge nor neglect to urge the court to so discriminate without breaching his pledge of loyalty and duty to at least one of his clients.

According to counsel in the instant case, at the time of sentencing he became aware for the first time of certain matters appearing in the reports of the probation officer. However, the only such matters now suggested which distinguished any one of his clients from the others insofar as mitigating the degree of culpability was concerned, were *post*-plea denials of guilt of the crimes to which pleas of guilty had been entered. The probation reports reveal no other background information which could justify an argument to the court that any one of the defendants should receive any different treatment at sentencing from the others.[8] The question remains, however, whether counsel might have, had he represented only petitioner, been able to urge to the court that Heath had committed the crime and that petitioner was innocent thereof. We cannot realistically conclude, for the reasons which follow, that such an argument could reasonably have been made or, if made, would have been entitled to any weight.

Counsel could not in good faith urge to the court that, although petitioner had acknowledged his guilt of the crime, his punishment should be mitigated because he had not in fact committed the crime. The then altered position, insofar as counsel was aware, was only that petitioner belatedly claimed that he had not committed the crime to which he had freely and voluntarily entered a guilty plea. The court, which had satisfied itself of petitioner's guilt at the time of taking his plea, could not be asked to be lenient on the sole ground that petitioner now disclaimed guilt. Thus, no matters which were truly of a *mitigating* nature were brought to the attention of counsel. The *post*-plea disclaimer might have suggested to counsel a motion to set aside the guilty plea if the situation otherwise warranted such a motion. However, petitioner did not ask counsel to so move and the mere claim of innocence asserted to the probation officer did not impose upon counsel an obligation to reevaluate his earlier recommendations. Under the

---

[8]The record before us contains copies of the probation reports of petitioner and Heath only. These reports reveal remarkably similar histories, criminal records, family and other backgrounds, and statements of attitudes relative to responsibilities for criminal conduct and intentions to conform in the future to acceptable social standards. Although the report in the case of De Rocco is not included in the record, petitioner does not attempt to distinguish his situation from that of De Rocco but claims only that, of those accused, only Heath was guilty.

facts of the instant case it did not impose upon him a duty to move to set aside the plea made in accordance therewith.

We are aware that we have said, in a case where a jury was required to fix life or death penalties, that "Conflicts of interest necessarily exist" where there are multiple defendants represented by a single counsel. (*People* v. *Chacon, supra,* 69 Cal.2d at p. 775.) There were compelling reasons in that case why the single attorney could not urge the most persuasive arguments against the imposition of the death penalty as to one without prejudicing the other defendants whom he also represented. It was nevertheless there recognized that convictions of multiple defendants represented by a single attorney during sentencing proceedings must not be reversed on mere technicalities, and we suggested then that the conflict may be ignored if its extent is sufficiently slight in nature. (69 Cal.2d at p. 775.) Although the Supreme Court has noted in a conflict of interest case that the right to "the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial," it nevertheless examined the record and concluded that counsel's representation of a particular defendant "was not as effective as it might have been" before it held that the trial court "thereby denied [the accused] his right to have the effective assistance of counsel, . . ." (*Glasser* v. *United States* (1942) *supra,* 315 U.S. 60, 76 [86 L.Ed. 680, 702].)

In *Lollar* v. *United States* (1967) 376 F.2d 243 [126 App.D.C. 200] the court, starting with the above quotation from *Glasser,* held that "only where ' "we can find no basis in the record for an informed speculation" that appellant's rights were prejudicially affected,' can the conviction stand. [Citations.] In effect we adopt the standard of 'reasonable doubt,' a standard the Supreme Court recently said must govern whenever the prosecution contends the denial of a constitutional right is merely harmless error. Chapman v. California, 386 U.S. 18. . . ." (376 F.2d at p. 247.) In *Chacon* we adopted as the test of prejudice requiring the granting of relief where a single counsel represents multiple defendants in circumstances suggesting a conflict of interest, "much the same position" as that taken in *Lollar.* (69 Cal.2d at p. 776, fn. 3.)

Our examination of the record in the instant case suggests that counsel at the probation hearing and at sentencing represented defendants whose interests at that time might possibly have been in conflict. We are satisfied, however, that such conflicts were of so slight a nature that they should be ignored. We need not indulge in "nice calculations" as to the amount of prejudice as we find no basis in the record for even an "informed speculation" that petitioner's rights were prejudicially affected, and

we are convinced beyond a reasonable doubt that petitioner was not prejudiced because of the joint representation. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *Glasser* v. *United States, supra,* 315 U.S. 60, 76; *Lollar* v. *United States, supra,* 376 F.2d 243, 247.)

The order to show cause is discharged and the petition for a writ of habeas corpus is denied.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.